UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────

DANIEL DELANO,

                              Plaintiff,

              -vs-                                    08-CV-610-HBS

UNITED STATES OF AMERICA,

                              Defendant.

───────────────────────────────────────

APPEARANCES:   J. MICHAEL HAYES, ESQ., Buffalo, New York, Attorney for
               Plaintiff.

               WILLIAM J. HOCHUL, UNITED STATES ATTORNEY (MICHAEL
               S. CERRONE, Assistant United States Attorney, of Counsel),
               Buffalo, New York, Attorneys for Defendant.


        In this action against the United States, brought pursuant to the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, plaintiff Daniel Delano seeks money

damages for injuries sustained on October 26, 2005, while unloading mail at the Post

Office in Dunkirk, New York, in the course of his employment with Wayman Trucking

under contract with the United States Postal Service ("USPS").  The parties consented

to have the undersigned conduct all proceedings in this case, including trial, the entry of

final judgment, and all post-trial proceedings, in accordance with 28 U.S.C. § 636(c)

and Rule 73 of the Federal Rules of Civil Procedure, and a non-jury trial on the issues

of liability and damages was held before this Court on October 5, 6, 7, and 11, 2011.

The parties submitted post-trial memoranda, and the Court heard final arguments on

January 24, 2012.

The following constitutes the Court's findings of fact and conclusions of law, in accordance with Fed. R. Civ. P. 52.[1]

## FINDINGS OF FACT

The facts relating to plaintiff's claim were developed at trial through the presentation of testimony and related exhibits received into evidence, summarized herein below. Plaintiff testified, and offered the testimony of Douglas Moreland, M.D., his treating neurosurgeon; former USPS employee Bohdan Panas; Dunkirk Postmaster Jami Sorrento; and economist Ronald Reiber, Ph.D. Defendant offered the testimony of John J. Leddy, M.D., Associate Professor of Clinical Orthopedics, as its expert medical witness.

### 1.    Plaintiff Daniel Delano

Plaintiff was born on September 10, 1961, and was 50 years old at the time of trial. He and his wife Margaret have been married for 25 years, and have two sons, aged 26 and 17. Plaintiff has a high school education. He obtained his commercial driver's license in 1991, and began working as a truck driver and mail delivery man for Wayman Trucking in 1993. Wayman Trucking contracts with the USPS to transport

---

[1]Rule 52 states in relevant part:

In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a). While "punctilious detail" is not required, *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir.1999) (internal quotation marks omitted), the Court must set forth its findings and conclusions sufficiently to permit meaningful appellate review. *See, e.g., United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000).

mail from the main Buffalo Processing and Distribution Center on William Street ("Buffalo P&DC") to several post offices in the region, including the post office in Dunkirk, New York.  Plaintiff worked for Wayman until mid- 2006, when Dr. Moreland advised him to seek less physically demanding work.  Tr. 11-15.[2]

On October 26, 2005, plaintiff arrived at the Buffalo P&DC at approximately 2:00 a.m. to begin his regular twice-a-day run between the Buffalo, Dunkirk, and Fredonia Post Offices.  According to standard procedure, he backed his truck up to an assigned door at the loading dock where a mail handler would help him load the mail brought from inside the facility.  At the Buffalo P&DC, the loading dock and truck line up "perfectly level," and a "flip plate" is manually positioned to allow for the load to be pushed from the dock on to the truck.  Tr. 17.  The load that day consisted of 3-5 all purpose containers ("APCs") for Fredonia, and one wire container (or "wiretainer") for Dunkirk.  The wire container was filled to the top with bundled magazines and catalogs, which plaintiff referred to as "five digit mail."  *Id.*  The mail handler used a forklift to bring the loaded wire container from inside the facility to the loading dock and drop it at plaintiff's truck door.  Plaintiff then pushed the three APCs and the wire container on to his truck.  He could not recall if the mail handler helped him push the load on to the truck that morning, although it was "most likely."  Tr. 18.  The load was secured inside the truck by 6-foot aluminum shoring bars attached to tracks along the interior side walls.  After loading his truck, plaintiff left the Buffalo P&DC and proceeded to the Dunkirk facility.  Tr. 15-19.

---

[2]References preceded by "Tr." are to pages of the trial transcript, consecutively numbered and entered on the Court's docket as Dkt. Nos. 62-65.

According to his regular schedule, plaintiff would arrive at Dunkirk at approximately 3:15 a.m., unload the Dunkirk mail, and proceed to the Fredonia facility, where he would arrive at approximately 3:30 a.m.  After unloading the Fredonia mail, he would return to Buffalo for the second, "hot mail" run (priority mail, express mail, letters, Social Security checks, etc.), scheduled to begin at 5:00 a.m.  On the day of the incident at issue, plaintiff arrived at the Dunkirk facility at approximately 3:00 or 3:10 a.m. and backed his truck up to the loading dock.  There is never anyone present at the Dunkirk Post Office at that early hour, but plaintiff had a key to the facility which he signed for at the Buffalo P&DC.  Because the loading dock is approximately three feet lower than the floor of the truck bed, there is a "scissor jack" located on the loading dock to assist with unloading the truck.  Plaintiff obtained the power cord for the scissor jack from inside the facility and raised the scissor jack to be flush with the truck bed floor.  He then unsecured the wire container and pushed it on to the scissor jack.  He lowered the jack and tried to push the wire container down a short inclined ramp and on to the dock, but the container became stuck on the concrete.  He testified that when the wire container is fully-loaded, it weighs about 3,000 pounds, and the protruding metal corners of the container often become stuck on the concrete floor as the wire container comes off the scissor jack on an incline.  He identified Exhibit 45 as a photograph of an empty wire container positioned on the inclined ramp between the scissor jack and the concrete floor of the loading dock at the Dunkirk facility, similar to the positioning of the fully-loaded wire container when it became stuck on October 26, 2005.  Tr. 19-24.

Plaintiff testified that he spent 20-25 minutes trying "everything in [his] power" to free the stuck wire container, but it would not budge.  He tried "juggling" the scissor jack

apparatus up and down, and manually pushing and pulling the wire container, all to no avail.  He testified that he considered unloading the wire container one piece at a time, but there were no other empty containers to put the mail in, and he was already behind schedule.  He noticed an extra shoring bar on the loading dock, and used it as a lever to lift the wire container enough to roll under its own weight down the incline and on to the loading dock.  Tr. 24-27.

Immediately after lifting up on the shoring bar, he stood up and felt a burning sensation in his back.  Although in pain, he pushed the wire container into the facility, locked the doors, and proceeded to Fredonia.  He was able to unload the APCs himself, since the loading dock at Fredonia is flush with the level of the truck.  He then returned to Buffalo for his second run, which he completed with help from mail handlers at all three facilities.  Upon returning to the Buffalo P&DC after his second run, he parked his truck and went to the emergency room at St. Joseph's Hospital.  Tr. 24-29.

Plaintiff testified that he also received emergency room treatment in 1996 following a motor vehicle accident.  In 2002, he felt tightness in his back when he picked up a mail bag, and went to the emergency room as a precaution.  He was involved in another motor vehicle accident in March 2005, approximately six months before the incident at issue, and reported to the emergency room with tightness in his upper chest.  On each of these occasions, he returned to work the next day and received no follow-up medical treatment.  Tr. 82-85.

Exhibit 47 is a series of two photographs depicting an empty wire container positioned on the scissor jack apparatus at the Dunkirk Post Office loading dock. Plaintiff identified a "drop down rod" on the front of the wire container.  According to

plaintiff, this rod also becomes stuck on the concrete, along with the protruding metal corners of the wire containers.  Exhibit 43 is a photograph depicting the gouges in the concrete loading dock floor.  Plaintiff testified that these gouges are caused by the wire containers coming off the ramp from the scissor jack.  Exhibit 46 is a photograph depicting a closer view of the apparatus.  Also visible is a Wayman's truck backed up to the loading dock in the vicinity of the scissor jack, showing the truck bed positioned well above the dock.  Exhibit 50 is a photograph depicting a "hand jack" positioned in front of the wire container.  According to plaintiff, this photograph demonstrates that the hand jack would not work under these circumstances because it does not fit under the wire container, and was designed for a different purpose.  Tr. 85-91.

Plaintiff testified that the same problem had existed at the Dunkirk facility since the introduction of this particular wire container in July-August 2005, just a few months prior to the incident at issue.  Every time these containers were used they would get stuck, whether they were fully loaded or completely empty.  Within the first week of their implementation, plaintiff complained about the problem to Jami Sorrento, the Dunkirk Postmaster, and to Bill Brown, the Supervisor.  He reiterated his complaints on a weekly basis.  Tr. 29-32.  In his view, the problem was caused by a combination of factors: overloading of the wire containers, and the design and construction of the loading dock at the Dunkirk facility.  Tr. 153-54.

Plaintiff testified that immediately after he finished his second run at 7:00 a.m. on October 26, 2005, he went right to St. Joseph's Hospital emergency room.  He was examined, given 800 mg. Motrin, and referred to Health Works physical therapy.  He returned to work on his next scheduled day.  He attended weekly physical therapy

sessions for approximately a month, and was referred to Dr. Collard, an orthopedic specialist.  Dr. Collard examined plaintiff, ordered an MRI, ordered plaintiff not to return to work, and referred him to Dr. Moreland.  According to plaintiff, physical therapy was not helping, and he was in significant pain, so he accepted Dr. Moreland's recommendation of surgery, which was performed on February 1, 2006.  Tr. 91-94.

Plaintiff was released to his home the same day of the surgery, but it was over a month before he was able engage in any physical activity.  He returned to physical therapy, which increased his strength, and followed with Dr. Moreland.  He went back to work in May 2006.  He still had some numbness in his left leg and foot, but the pain had decreased.  He moderated his work activity with respect to delivery of heavy, bulky mail, and refused to deliver heavily loaded wire containers.  Tr. 94-99.

On July 6, 2006, plaintiff was on his way to Dunkirk on his afternoon run.  He stopped for fuel, and stepped out of his truck.  When he reached the ground, he buckled over in pain and could not move.  He managed to call his boss in Binghamton, and an alternate driver was sent to finish the delivery run.  Plaintiff drove the alternate's car back to Buffalo.  He stayed out of work until he was able to see Dr. Moreland, approximately three weeks later.  Dr. Moreland ordered an MRI, and upon further evaluation recommended physical therapy three times per week.  He also recommended that plaintiff not return to his job delivering heavy loads of mail, and suggested occupational retraining.  Tr. 99-103.

Plaintiff contacted Mueller Security, and was eventually offered a job in October 2006, at a rate of $7.50 an hour.  He had been earning $22 an hour at Wayman Trucking.  He worked for Mueller until August 2007, when he was hired by J.C. Penney

as a Loss Prevention Officer, starting at $9.50 an hour.  He makes $16.50 an hour in

his current position as Loss Prevention Supervisor.  His job duties include internal and

external investigations of retail theft and fraud, monitoring closed circuit TV systems,

safety audits, and other loss prevention activities.  He recently received an award from

J.C. Penney recognizing his efforts in reducing losses from theft or misappropriation at

the store from 2.47% of total inventory in 2008 to .96% in 2010, realizing a savings to

the company of over $250,000.00.  He also currently works two nights per week for

Independent Security.  He has never collected unemployment, and does not anticipate

doing so in the future.  He plans to work full-time for one or two more years, then part-

time for a while.  He testified that his back problems continue to cause certain functional

limitations, both at work and at home.  He takes pain medications, and uses a TENS

unit.  He has received workers' compensation as a result of his injury, and took a lump

sum buyout which resulted in a net payment of $70,200.  He had to sell his boat and his

classic car in order to pay his bills.  Tr. 103-14; 157-60.

Plaintiff testified on cross-examination that he worked for Wayman Trucking for

approximately 14 years.  During that time he lifted and carried heavy items such as

canvas mail bags and USPS tubs, and had to push heavy APCs, canvas hampers, and

wire containers filled with mail, all on a daily basis.  His back would occasionally get

sore, but not to the point where he would need medical attention.  In fact his whole

body would get sore from the physical demands of the job.  At the time of the incident at

issue, plaintiff was 5' 11" tall and weighed 275 pounds.  Tr. 161-70.

Plaintiff testified that he suffered a bruised hip as a result of the motor vehicle

accident in 1996.  In 2002 he suffered a muscle strain in his back while lifting a canvas

mail bag.  In the March 2005 motor vehicle accident he hurt his upper chest.  Tr. 173-76.

Following his surgery, which was performed on February 1, 2006, plaintiff returned to work in May 2006 without restriction.  He still had some numbness in his leg, but his back problems had improved with therapy.  He worked without incident for eight weeks prior to July 6, 2006, when he felt sharp pain in his back as he stepped out of his truck.  He went back to Dr. Moreland, who compared the results of a new MRI with previous studies.  Dr. Moreland advised plaintiff that there was no new herniation, and no need for further surgery.   Tr. 176-80.

Plaintiff testified that the majority of his working day as a Loss Prevention Supervisor at J.C. Penney involved sitting inside a camera room watching closed-circuit television, and sitting at his desk doing safety audits.  He would occasionally walk the floor to supervise his subordinates and keep an eye on the store.  He did not do any lifting.  Tr. 180-81.

Plaintiff testified that, prior to his accident, he had never refused an overloaded wire container at the Buffalo P&DC.  If he saw that the container was overloaded he would ask the mail handlers to break the load down into two containers.  When he arrived at the Buffalo P&DC on October 26, 2005 and saw the overloaded wire container, he could have found a mail handler to break the load down.  He could have called his boss in Binghamton to let him know about the overloaded container, and about the problem he had unloading it at the Dunkirk facility.  He could have called the transportation desk or the expediter's desk at the P&DC for directions, and he could have partially unloaded the stuck wire container.  Tr. 182-90.

On redirect, plaintiff testified that he had no recollection of ever refusing a load of mail prior to the incident on October 26, 2005.  He could have called his boss in Binghamton that morning and awakened him at 3:00 a.m.  He could have called the P&DC, but his experience is that no one answers the phone at that early hour.  He testified that maintaining the delivery schedule is very important because the mail effects the lives of so many people.  It crossed his mind to partially unload the wire container, but there were no other containers on the loading dock to put the mail in.  He did try to get the container loose by maneuvering the scissor jack, but it would not move.  Tr. 190-93.

### 2.    Douglas Moreland, M.D.

Dr. Moreland testified that he is a board certified practicing neurosurgeon focusing on treatment of diseases involving the cervical, thoracic and lumbar spine.  He is also on the teaching faculty at the University of Buffalo Medical School and the Daemen College physicians assistant program.  He has published several articles and lectured on surgical procedures for treatment of herniated discs, including microdiscectomy of the type he performed on the plaintiff, Daniel Delano.  Tr. 35-36.

Dr. Moreland first saw plaintiff on January 10, 2006.  Plaintiff reported that he was attempting to dislodge a 2,000 pound container of mail at work on October 26, 2005, when he began to have severe pain in his back and left leg.  Plaintiff had tried physical therapy without improvement, and was taking strong pain medications.  Upon examination, Dr. Moreland noted significant loss in range of motion of the lower back, with pain down the left leg.  Straight leg raising on the left side was positive to 30

degrees, indicating significant irritation to the nerve root as a sign of disc herniation.

Review of plaintiff's recent MRI (Exhs. 34, 52 and 53) revealed a large free fragment

disc herniation on the left side at the L4-L5 level.  Based on the demonstrated level of

pain, indication of neurological deficit, and the results of physical therapy, Dr. Moreland

recommended surgery.  Tr. 36-41.

Dr. Moreland requested and received workers' compensation authorization for

microdiscectomy, which he performed on February 1, 2006.  He described the surgical

procedure in detail, as reflected in his office records (Exh. 6).  The ultimate goal of the

procedure was to remove the disc fragments causing pressure on the nerve.   This

procedure is typically performed as outpatient surgery.  Dr. Moreland's notes reveal that

he saw plaintiff on regular follow-up visits during his post-operative period of disability.

On February 16, 2006, plaintiff had less pain, but still had numbness, tingling, and

weakness in his left leg.  On April 6, plaintiff reported continuing improvement overall.

He still had some foot drop as a result of damage to the L4-L5 nerve root caused by the

disc rupture.  On May 4, plaintiff indicated that he had gone back to work. He still had

some numbness and foot drop on the left side, but stated that it did not bother him.  He

was motivated to return to his job at Wayman Trucking, and Dr. Moreland gave him

permission to do so.  Tr. 41-46.

Dr. Moreland saw plaintiff again on July 25, 2006.  Plaintiff reported that he had

been off from work for about three weeks from severe back pain after feeling a sudden

grabbing in his back as he was stepping out of his truck.  Physical examination revealed

75% loss of range of motion in his back, and slow and deliberate gait, with a fair

amount of pain.  Dr. Moreland ordered an MRI, which he reviewed with plaintiff at a visit

on August 24, 2006.  At that time, plaintiff was having intermittent stabbing back pains on his lower left side, radiating into his buttocks.  Review of the MRI showed normal post-operative changes at L4-5, with some scar tissue.  Dr. Moreland did not feel that further surgery was necessary.  He recommended physical therapy and vocational retraining, finding plaintiff to be disabled from his job driving a truck and pushing around heavy wire mail containers.  Dr. Moreland made the assessment that the pain plaintiff experienced as a result of the July 2006 occurrence was related to the original injury in October 2005.  This was based on the character and location of the pain reported by plaintiff at the L4-5 location, as well as the large size of the herniation as indicated by the images on the MRI.  According to Dr. Moreland, plaintiff had significant nerve damage, which made him vulnerable to subsequent aggravation.  Tr. 46-55.

Dr. Moreland saw plaintiff for the last time in October 2006.  Plaintiff reported continuing significant back pain.  He was given a transelectrical nerve stimulation ("TENS") unit, which sends a subtle electrical charge to the nerve to override the pain stimulation.  Dr. Moreland assigned 40% permanent partial disability relative to the original injury in October 2005, and released plaintiff for work under that limitation. Tr. 55-57.

Dr. Moreland testified that plaintiff's ability to perform his security job under his current medications and with the freedom to rest, stretch, and otherwise take measures to alleviate his pain, is within the standard deviation of what could reasonably be expected as the employment status for a person with this type of injury following this type of surgery.  Dr. Moreland also stated his opinion that, statistically, it was more likely that plaintiff will not be able to work to the age of 65, and that he has already worked

beyond what the statistics show a 50-year old male with plaintiff's injury would ordinarily be able to work.  Tr. 57-60.

On cross-examination, Dr. Moreland testified that when he first saw plaintiff in January 2006 he did not report any pre-existing back injuries, and there is no mention in Dr. Moreland's records of plaintiff's pre-existing injuries as the result of lifting a large canvas mail bag on April 21, 2002, or motor vehicle accidents in 1996 and March 2005. He testified that he was aware that plaintiff had performed the physically demanding job at Wayman Trucking for 14 years, and that plaintiff was clearly overweight at the time of the injury at issue.  The MRI taken in October 2005 showed not only disc herniation at L4-5, but also degeneration at L4-L5 and L5-S1.  Based on these circumstances, and in the absence of a pre-accident MRI, it was possible that th L4-L5 herniation existed prior to the October 26, 2005 accident.  Tr. 62-73.

Three months after surgery, plaintiff had complete resolution of his back and leg pain.  He still had numbness and foot drop, which had improved but was not completely resolved.  Dr. Moreland cleared plaintiff to return to work without restriction in May 2006.  Following plaintiff's injury in July 2006, Dr. Moreland ordered and reviewed new MRI images.  There was no new herniation or injury at the L4-L5 level, and further surgery was not recommended.  Dr. Moreland's opinion that the July 2006 injury was causally connected to the October 2005 injury is based on plaintiff's self-reporting of symptoms.  Tr. 73-76

On redirect, Dr. Moreland testified that given plaintiff's medical and work history following his three prior emergency room visits, it was still his opinion to a reasonable degree of medical certainty that plaintiff's L4-L5 herniation was the result of the

October 26, 2005 incident at issue.  In reaching his conclusions when he testifies in personal injury cases, whether as the plaintiff's treating physician or as an independent medical examiner for insurance companies, Dr. Moreland bases his conclusions on the physical examination; how well the medical history reported by the patient correlates with the information in the medical records; the imaging studies; and the credibility of the patient.  In this case, Dr. Moreland found plaintiff to be very credible.  Tr. 77-80.

###    3.    Bohdan Panas

Mr. Panas is retired from the USPS.  He was working at the Dunkirk Post Office on October 26, 2005.  He was not present at 3:00 a.m. when plaintiff got hurt, but he was present at approximately 7:15 a.m. when plaintiff returned with his second load. He spoke with plaintiff, and noticed that he was in some discomfort.  Plaintiff told Mr. Panas that he got hurt as he was trying to push a heavy wire container which had become stuck on the dock.  Tr. 119-23.

Mr. Panas testified that there was a metal bar that would get caught on the concrete when the wire container became top heavy.  Exhibit 44 is a photograph depicting the metal bar and corner protection devices on the type of wire container in use at the time.  Mr. Panas testified that, when the wire container was too heavy, the entire front part of the container would become stuck on the concrete as it came off the scissor jack.  This condition had existed at the Dunkirk facility ever since this particular wire container design had been implemented, and it was something the other employees and drivers were aware of and complained about.  Mr. Panas did  not recall

speaking with the postmaster about the problem, but he did speak with a supervisor named Kim.  Tr. 123-27.

Mr. Panas testified further that the problem occurred when the wire container was loaded to the top.  If the container was empty or up to one-quarter full, there was no problem pushing it off the scissor jack and onto the dock.  If the container was full, it weighed 2,500 or 3,000 pounds and would get stuck on the concrete.  It was the delivery person's job to get the mail off the truck and onto the dock.  If a container got stuck, the postal employees at the facility would often help push the container on to the dock, but there was no one there to help at 3:00 a.m.  Tr. 128-30.

### 4.    Jami Sorrento

Ms. Sorrento has been the Postmaster at the Dunkirk Post Office since 2001. She is responsible for oversight of the entire operation.  When she arrived at the post office at 8:30 a.m. on October 26, 2005, Mr. Panas told her about plaintiff's injury.  As part of her duties as Postmaster, Ms. Sorrento conducted an inquiry into the incident. Exhibit 58 is a Report of Hazard, Unsafe Condition or Practice, signed by Mr. Panas on October 26, 2005, which Ms. Sorrento reviewed and signed the next day.  Mr. Panas wrote on the report that the large metal containers are too heavy to push around; they are almost impossible to push through the doors; pushing the heavy container can be harmful physically; and it was impossible to stop the container's momentum.  Tr. 131-38.

Ms. Sorrento testified that these particular wire containers had been in use at the Dunkirk facility for a few months prior to plaintiff's accident.  The complaints started

soon after their implementation.  She had spoken with the Wayman Trucking drivers and postal employees about the problems they were having pushing the containers around when they were heavily loaded, and she was aware that the containers would catch on the concrete and cause gouging.  She spoke with people working at the Buffalo P&DC to try to get them to stop sending the heavily loaded wire containers, to no avail.  She also brought the matter up at a district-wide Postmasters' meeting in Mt. Morris prior to the accident at issue, but no other facility was having this problem with the wire containers.  Tr. 138-42.

Ms. Sorrento testified that it was plaintiff's responsibility to unload the early morning mail, bring the mail into the vestibule, and lock the vestibule doors.  It would not be acceptable to leave the mail unattended on the loading dock.  Prior to the accident, most of the Dunkirk facility employees were aware of the problem of overloaded wire containers becoming stuck on the loading dock.  There are forklifts and hand jacks available on the dock, but these devices do not fit under the wire containers.  Ms. Sorrento was not aware of any other mechanical devices that might be available to assist with the operation, and made no inquiries in this regard.  Tr. 143-46.

On cross-examination, Ms. Sorrento testified that she advised mail clerks at the Dunkirk facility that when an overloaded wire container was delivered they should unload it until it becomes easier to move.  The containers have sides which drop down making it easier to unload.  The load usually consists of "flats," described as 8 by 10 inch-size pieces of mail such as magazines and catalogues shrink-wrapped into bundles.  There are also flat buckets to hold these items, all of which can be lifted out of the wire container and placed on the dock, or in other containers.  Tr. 147-48.

Ms. Sorrento testified that the volume of mail delivered to the Dunkirk Post Office by Wayman Trucking has dropped off since 2005.  There are no Sunday deliveries, and there are discussions in Congress about eliminating Saturday deliveries as well.  There USPS is also discussing whether to eliminate one of the two morning runs between Buffalo and Dunkirk.  Tr. 149-52.

### 5.     John Leddy, M.D.

Dr. Leddy is board certified in internal medicine and sports medicine.  He is an associate professor of clinical orthopedics at the University of Buffalo Medical School. He is not a surgeon.  His work consists of non-operative orthopedic clinical treatment of patients, research, and teaching.  He has given lectures on back injuries, and sees many patients with back problems.  If the patient does not respond to non-surgical treatment, and if called for by the medical history and diagnostic imaging, he will refer the patient for surgery and will perform post-surgery follow up.  He has experience interpreting MRIs, and with treatment of obesity.  Tr. 200-05.

In rendering his opinion and testifying with regard to plaintiff's medical condition on behalf of the government in this case, Dr. Leddy reviewed plaintiff's hospital records; surgical records; medical records and reports from Drs. Moreland, Rehmatullah, Henry, and Calabrese; MRIs; and plaintiff's deposition transcripts.  He also performed an independent medical examination ("IME") of plaintiff in June 2009, which included orthopedic and neurological evaluation.  Exhibit 25 is Dr. Leddy's report of the examination.  Plaintiff was 5' 10" and weighed 280 pounds.  He carried a lot of weight in the mid-section, which can be expected to have a detrimental effect on the lower back.

His body mass index ("BMI") was 40, indicating morbid obesity which has a negative effect on life expectancy as well as work life expectancy.  In Dr. Leddy's opinion, given plaintiff's obesity and the physical demands of his job, plaintiff could be expected to have been able to work at Wayman Trucking until the age of 54, absent his injury at age 44.  Tr. 206-12.

Dr. Leddy 's review of plaintiff's medical records indicated evidence of pre-existing back injuries in April 2002, when he was treated for injury to the left sacroiliac joint, and in March 2005, when he was treated for mid-back and right shoulder pain following a car accident.  There was also indication of similar injuries prior to 2002. Dr. Leddy was not surprised by plaintiff's testimony regarding soreness in his back from performing the regular duties of his job at Wayman Trucking.  Tr. 212-15.

During his IME, plaintiff reported that he injured his back while using a large shoring bar to lever a container that got stuck as he was unloading it from his truck. MRIs taken in December 2005 (after the accident but prior to surgery) indicated degenerative disc disease at multiple levels, with disc herniation at L4-L5, caused by the work injury in October 2005.  In Dr. Leddy's opinion, the disc degeneration was caused over time by plaintiff's age, weight, and the physical demands of his job.  Tr. 215-18.

Dr. Leddy testified that the discectomy surgery performed by Dr. Moreland in February 2006 was a success.  Dr. Leddy was shown Exhibit 26, which contains images from the MRI taken on August 4, 2006, following the incident in June 2006 when plaintiff experienced pain as he stepped out of his truck.  The images reveal surgical changes at L4-5 and the same degenerative changes at L5-S1, but no new

disc herniation, consistent with Dr. Moreland's assessment.  However, Dr. Leddy

disagreed with Dr. Moreland's opinion that the incident in July 2006 represented an

aggravation of the original injury in October 2005.  Rather, in Dr. Leddy's opinion, the

July 2006 incident represented a new injury because the MRI shows no evidence of

aggravation, exacerbation or re-injury at the L4-5 level.  According to Dr. Leddy, Dr.

Moreland's assessment was based on plaintiff's self-reporting regarding the character

and location of the pain, and it is well-known that pain patterns are unreliable in

establishing a level of spinal injury because they overlap.  Dr. Leddy testified that in his

opinion, considering plaintiff's testimony with respect to his activities in his current

position as a Loss Prevention Supervisor, plaintiff could be expected to work until his

retirement age of 65.  Tr. 218-23.

On cross-examination, Dr. Leddy testified that the incident of October 26, 2005

resulted in a herniated disc at L4-5, and that plaintiff was disabled from his employment

from that date until approximately three months after his surgery in February 2006.  The

prior history of thoracic and shoulder injuries and muscle spasms had no relation to the

L4-5 herniation.  The second injury occurred in July 2006, while plaintiff was back at

work for Wayman Trucking.  As part of workers' compensation, treating physicians are

required to attest to the relationship between the treatment rendered and the work injury

in order to receive payment.  In addition, insurance carriers for the Workers'

Compensation Board ordinarily conduct their own independent medical examinations.

Dr. Leddy reviewed the report of Dr. N. Rehmatullah (Exh. 15, pp. 188-92), an

orthopedic surgeon who performed an IME of plaintiff on behalf of the workers'

compensation carrier in June 2006.  Dr. Rehmatullah reported that plaintiff had back

and leg pain, numbness and weakness in the left leg and foot, and was unable to walk on his left heel.  He was found to be mild to partially disabled, and restricted from bending and lifting over 20 pounds.  This report shows that as of June 2006, plaintiff had not completely recovered from the October 2005 injury.  Tr. 224-30.

Dr. Leddy's conclusion that plaintiff's injury in July 2006 was unrelated to the October 2005 injury was based on his examination of plaintiff in June 2009, nearly four years after the original accident.  He agreed that, while pain patterns are generally recognized as unreliable, they can be of value to a knowledgeable physician.  He indicated in his report that the second injury was at a different level than where the surgery was performed, but he did not indicate what the level was.  In addition to the reports of Dr. Moreland and Dr. Rehmatullah, Dr. Leddy also reviewed the reports of IMEs performed on behalf of the workers' compensation insurance carrier by Dr. Barry Katzman (March 2007, Exh. 7, pp. 334-36) and Dr. Owen Young (March 2008, Exh. 18, pp. 1375-79), as well as the records of Dr. Ashraf Henry, a pain management specialist (Exh. 11).  All of these physicians related plaintiff's present symptoms and complaints to the original injury in October 2005.  However, Dr. Leddy testified that he considered more information than these treating and examining physicians had, and came to the conclusion that plaintiff's current symptoms are related to the second injury combined with his degenerative disease, not the first injury which he recovered from.  Tr. 230-38.

### 6.    Ronald Reiber, Ph. D.

Dr. Reiber received his doctorate in economics from the University of Arizona. He has been a member of the faculty in the Economics Finance Department at

Canisius College since 1971 .  He was engaged by plaintiff in this case to provide expert testimony regarding lost wages and economic damages sustained as a result of the accident and injury at issue in this case.  He reviewed information relating to plaintiff's work activity and wages earned before the accident and after he returned to work, and provided calculations of losses sustained up to the present time, as well as anticipated future losses.  Tr. 254-59.

In his most recent report, dated October 7, 2011 (Exh. 65), Dr. Reiber noted plaintiff's date of birth (September 10, 1961); the date of his injury (10/26/05); plaintiff's age at the end of the year of injury (44); the date used to separate past and future losses (10/7/11); and plaintiff's normal life expectancy, as represented by standard government tables (age 78).  As reflected in his W-2 statements, plaintiff averaged $38,565 a year at Wayman Trucking for the three years prior to the accident.  Based on the wage rates in effect in October 2011, he would currently be earning approximately $52,000 in wages and overtime at Wayman.  Adjusting for inflation, Dr. Reiber calculated that had plaintiff not been injured he would have earned $246,900 in wages, plus $19,207 in 401(k) contributions, from 2006 through the date of trial.   He then subtracted the income plaintiff actually earned following his injury ($135,085), resulting in past economic loss of $131,021.  Dr. Reiber then calculated future economic loss for each year, ending on plaintiff's birthday and adjusting for inflation.  By way of example, according to these calculations had plaintiff not been injured and continued working for Wayman Trucking until full Social Security age 67, he would have earned $1,122,633 in wages and $87,333 in 401(k) contributions.  Subtracting his adjusted actual earnings at J.C. Penney and Independent Security through age 67, amounting to $829,244,

plaintiff's cumulative future economic loss at full Social Security age would be $380,752.  Dr. Reiber also calculated future economic loss without subtracting adjusted actual earnings beyond age 53, based on the assumption that plaintiff will be unable to work past that age.  This results in cumulative future economic loss in the amount of $1,091,474 at full Social Security age.  Finally, Dr. Reiber adjusted his past and future economic loss calculations to incorporate the likelihood of unemployment, using the standard method of reducing the number of compensable work weeks from 52 to 49. Tr. 259-73.

On cross-examination, defense counsel pointed out several discrepancies between the calculations made by Dr. Reiber in his earlier report, attached to an affidavit dated February 4, 2010 (Exh. 22), and his October 2011 report (Exh. 65) which he relied upon as the basis for his direct testimony.  According to Dr. Reiber, the earlier report was based on information made available to him at the time, and his later report was updated to reflect more complete wage information.  He explained that his calculations with respect to the anticipated growth of both salary and 401(k) contributions are based on the long term average inflation rate of 2.6%.  Tr. 275-303.

Dr. Reiber further explained on redirect examination that his original report incorporated plaintiff's wage and earnings data from 2002 through 2009.  He modified the report as more complete and detailed information became available regarding plaintiff's earnings at Wayman Trucking, J.C. Penney, and Independent Security. According to Dr. Reiber, these modifications resulted in a more accurate basis for his opinions as to plaintiff's past and future economic losses.

## CONCLUSIONS OF LAW

**I.     Liability**

**A.     Negligence Under the FTCA**

Pursuant to the Federal Tort Claims Act, the federal government has consented to be sued for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); *see Ford v. United States*, 2000 WL 1745044, at *4 (S.D.N.Y. Nov. 27, 2000) ("Under the FTCA, the liability of the United States for the negligent acts of its agents is governed by the law of the state in which the alleged negligence occurred."), *quoted in Kwitek v. U.S. Postal Service*, No. 07CV826, 2010 WL 3992192, at *9 (W.D.N.Y. Oct. 12, 2010) (Curtin, J.). The parties agree that, since the allegedly negligent acts and omissions forming the basis for plaintiff's action took place in New York State, New York negligence law governs this case.

Thus, in order to establish the government's liability for negligence in this case, plaintiff must show by a preponderance of the evidence that: "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach."  *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) (citing *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)); *see also Kwitek, supra*, 2010 WL 3992192, at *9.

1.      **Duty**

"[A] a duty of reasonable care owed by a tortfeasor to an injured party is elemental to any recovery in negligence."  *Palka v. Servicemaster Management Services Corp.*, 83 N.Y.2d 579, 584 (1994).  As recognized by the Second Circuit, "[t]he existence of a duty is thus a *sine qua non* of a negligence claim: 'In the absence of a duty, as a matter of law, no liability can ensue.' "  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d. Cir. 2000) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)).

It is well settled in New York that a landowner, including the federal government as owner of a postal facility, has a general duty to " 'exercise reasonable care to maintain its premises in a safe condition in view of the circumstances  . . . .' "  *Robinson v. United States*, 330 F. Supp. 2d 261, 287 (W.D.N.Y. 2004) (quoting *Michalski v. Home Depot Inc.*, 225 F.3d 113, 117 (2d Cir. 2000)); *see also Basso v. Miller*, 40 N.Y.2d 233, 241 (1976).  As stated by the New York Court of Appeals:

> The nature and scope of that duty and the persons to whom it is owed
> require consideration of the likelihood of injury to another from a
> dangerous condition on the property, the seriousness of the potential
> injury, the burden of avoiding the risk and the foreseeability of a potential
> plaintiff's presence on the property.

*Galindo v. Town of Clarkstown*, 2 N.Y.3d 633, 636 (2004), quoted in *Kwitek*, *supra*, 2010 WL 3992192, at *11.

Considering these factors in light of the preponderance of the evidence presented at trial, the Court finds that the circumstances encountered by plaintiff during his first run on October 25, 2005, including the overloaded wire container weighing as

much as 3,000 pounds; the alignment and operation of the scissor jack apparatus at

the Dunkirk loading dock; the absence of mail handlers or other postal employees at

the scheduled delivery time; and the absence of any other operable means of

mechanical assistance, combined to create a dangerous condition which presented a

significant risk of serious injury to plaintiff. The proof also shows that the risk could

have been avoided at minimal expense by, for example, using different containers to

transport the mail, or dividing the load into two wire containers which could be more

easily maneuvered on the dock. The risk of injury to plaintiff was also foreseeable,

since plaintiff himself complained about the problem to the Dunkirk Postmaster, the

Facility Supervisor, and other postal employees soon after the new wire containers

were implemented, and reiterated his complaints on a regular basis. Under these

circumstances, it is clear to the Court that the USPS had a duty of care to provide

plaintiff and other mail delivery personnel a reasonably safe method of unloading the

early morning mail at the Dunkirk facility.

## 2. Breach

The testimony at trial also establishes by a clear preponderance that the

government breached its duty of care by failing to take any corrective measures despite

having actual notice of the dangerous condition. As outlined above, the Dunkirk

Postmaster and Facility Supervisor were made aware soon after the new wire

containers were implemented that the truck drivers and mail handlers were having

problems maneuvering the heavily loaded wire containers onto and around the loading

dock. The Postmaster brought this problem to the attention of employees at the Buffalo

P&DC and other USPS officials, but no action was taken.  The testimony also establishes that simple, relatively inexpensive measures were available to alleviate the problem, such as lighter loads and more maneuverable containers, but the heavily loaded wire containers kept coming.

The government argues that it should not be charged with breach of duty because the proof indicates there were several things plaintiff could have done, besides using the shoring bar as a lever, that would have minimized the likelihood of injury.  For example, he could have refused to take the overloaded wire container at the P&DC, or asked the mail handler to split the load into two containers; he could have telephoned the P&DC, or his boss, for guidance once the wire container got stuck; or he could have partially unloaded the wire container to make it easier to move.  However, plaintiff's failure to take available ameliorative measures, or his use of the shoring bar, does not negate the government's duty of care to plaintiff, or its breach; rather, plaintiff's conduct with regard to the incident "simply raise[s] issues of fact as to [his] comparative fault."  *Tuttle v. Anne LeConey, Inc.*, 258 A.D.2d 334, 335, 685 N.Y.S.2d 204, 204-05 (1st Dep't 1999).

### 3. Damage and Proximate Cause

In addition to establishing the government's breach of a cognizable duty of care, "[a]s in any other negligence case, a plaintiff in a Federal Tort Claims Act case must also establish by a preponderance of the credible medical evidence that the injury complained of was causally related to the occurrence."  *DiPirro v. United States*, 43 F. Supp. 2d 327, 342 (W.D.N.Y. 1998) (Heckman, Mag. J.) (citing cases).  In this regard,

the government does not dispute – and the Court finds – that the occurrence on October 26, 2005, was the proximate cause of plaintiff's disc herniation at L4-L5 which resulted in the microdiscectomy surgery performed by Dr. Moreland on February 1, 2006.  This finding is fully supported by Dr. Moreland's testimony and the reports of examining physicians (including defendant's medical expert, Dr. Leddy), as well as the diagnostic imaging studies and other documentary medical evidence.

Relying on the opinion of Dr. Leddy, the government contends that there is no credible medical evidence to support Dr. Moreland's opinion that the injury suffered by plaintiff when he stepped off his truck on July 6, 2006, was an aggravation of, and was causally related to, the disc herniation injury suffered on October 26, 2005.  According to Dr. Leddy, since the August 2006 MRI did not show any new herniation as a result of the July, 2006 incident, Dr. Moreland's assessment as to the relationship between the two incidents was based solely on plaintiff's self-reporting of symptoms which, in Dr. Leddy's opinion, is an unreliable basis for a medical opinion on causation. Following this reasoning, the government argues that any finding of liability for negligence on the part of the USPS must be limited by the full resolution of plaintiff's original injury three months after his surgery, as evidenced by his return to work without restriction in May, 2006.

However, this Court's review of the medical evidence of record reveals ample support for Dr. Moreland's assessment to find in favor of plaintiff on this point as well. Specifically, plaintiff has produced the records of two orthopedic surgeons, Dr. Katzman and Dr. Young, who performed IMEs of plaintiff on behalf of the Workers' Compensation Board in 2007 and 2008 and found plaintiff's mild to moderate disability

to be causally related to the original injury in October 2005.  On the other hand,

Dr. Leddy identified no objective findings to support his opinion that the July 2006 injury

occurred at a different level than L4-5, beyond his own observations following an

examination of plaintiff in June 2009 – almost four years after the original injury.  He

testified that he reached his opinion after considering more information than the other

physicians had, but was unable to specifically identify any such information.

The government also argues that even if this Court finds a causal connection

between the defendant's conduct and the injury complained of, plaintiff's conduct

constitutes an intervening or superseding cause relieving the USPS of liability because

it was simply not foreseeable that plaintiff would attempt to use a shoring bar as a lever

to move the 3,000 pound mail container off the scissor jack ramp.  In this regard, the

New York courts have held that "a defendant's conduct is not the proximate cause of a

plaintiff's injury if there is an 'intervening act [that] is extraordinary under the

circumstances, not foreseeable in the normal course of events, or independent of or far

removed from the defendant's conduct.' "  *Bacon v. United States*, 104 Fed. Appx. 208,

209 (2d Cir. 2004) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315

(1980)).  Thus, a plaintiff's "reckless and unforeseeable" actions may sever the causal

connection between the defendant's conduct and the plaintiff's injuries.  *Tryon v.

Square D Co.*, 275 A.D.2d 567, 568-69, 712 N.Y.S.2d 676, 678 (3d Dep't 2000).

Based on the testimony and documentary evidence presented at trial, the Court

cannot conclude that plaintiff's conduct was sufficiently reckless or unforeseeable to

break the chain of causation and relieve the government of liability in this case.  As

discussed above, the USPS was fully aware that the heavily-laden wire containers

would sometimes get stuck when coming off the scissor jack ramp and on to the loading dock at the Dunkirk facility.  Given the failure of the USPS to address the situation despite repeated complaints, it was therefore entirely foreseeable that the problem might occur on plaintiff's early morning run, and that plaintiff might need to take whatever means necessary to unload the stuck container in order to maintain his delivery schedule.  While partial unloading of the container was certainly an option, there was no evidence or argument presented at trial to suggest that this option was any less likely to result in the type of injury suffered by plaintiff than using a shoring bar as a lever.  Under these circumstances, the Court finds that plaintiff's conduct was not so reckless, extraordinary, or unforeseeable as to sever the causal connection between defendant's failure to correct the dangerous condition at the loading dock and the injury caused by that failure.

Accordingly, this Court finds by a preponderance of the credible medical evidence that the injury suffered by plaintiff on July 6, 2006 was causally related to the occurrence on October 26, 2005, and that both injuries were the proximate result of defendant's negligence in failing to address the dangerous condition at the loading dock of the Dunkirk Post Office.

### B.    Comparative Negligence

Having found that plaintiff has established the elements of his negligence claim, the Court next takes up the question of comparative negligence.  Under the law of New York regarding comparative liability, a plaintiff's damages "otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant

or decedent bears to the culpable conduct which caused the damages."  N.Y.C.P.L.R. § 1411; *see Robinson*, *supra*, 330 F. Supp. 2d at 289 (citing *Catherman v. United States*, 1992 WL 175258, at *14 (N.D.N.Y. July 21, 1992) (plaintiff "owed a duty to himself to recognize obvious hazards and exercise the appropriate level of caution."); *Lolik v. Big v. Supermarkets*, 210 A.D.2d 703, 704, 620 N.Y.S.2d 167, 169 (3d Dep't 1994) (plaintiff was "bound to see what by the proper use of her senses she might have seen."), *rev'd on other grounds*, 86 N.Y.2d 744 (1995)).  Defendant bears the burden of proof on this affirmative defense.  N.Y.C.P.L.R. § 1412 ("Culpable conduct claimed in diminution of damages, in accordance with section fourteen hundred eleven, shall be an affirmative defense to be pleaded and proved by the party asserting the defense."); *Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565, 569 (S.D.N.Y. 2011).

In order to assess whether the government has met its burden on the issue of comparative negligence, the Court as trier of fact "must weigh all factors that caused [the] injury and the relative culpability of each party for those contributing factors.  There is no magic formula governing the analysis."  *Furey v. United States*, 458 F. Supp. 2d 48, 55 (N.D.N.Y. 2006).

In this case, as alluded to above, the government argues that plaintiff acted negligently because there were several steps he could have taken to address the situation with minimal likelihood of injury, such as refusing to take the overloaded wire container at the P&DC, asking the mail handler to split the load into two containers, or using his cell phone to call for guidance.  Based on plaintiff's credible testimony, it is clear to the Court that refusal of the container was not an option considered by plaintiff,

since he had never refused a load in fourteen years driving mail delivery trucks prior to his injury.  Using his cell phone to call either his boss or a USPS "expediter" when the container got stuck on the Dunkirk loading dock presented even less of a viable option, considering his need to adhere to the delivery schedule, as well as the likelihood that he would get no helpful guidance at 3:00 a.m. from his boss in Binghamton or from anyone at the P&DC.

However, notwithstanding plaintiff's testimony as to his belief that he tried "everything in [his] power" to free the wire container from the scissor jack, the preponderance of the evidence at trial establishes that plaintiff did not pursue the option which, in this Court's view, presented the best solution under the circumstances – unloading enough mail from the wire container to allow it to roll off the scissor jack and on to the loading dock.  Indeed, as Postmaster Jami Sorrento testified, this was the recommended procedure for handling overloaded wire containers at the Dunkirk facility. Tr. 147-48.  Plaintiff testified that he considered this option, but decided against it, primarily because there were no empty containers available at the facility to load the mail into.  Tr. 26.  However, Ms. Sorrento also testified that the mail could have been lifted out of the unloaded container and placed on the loading dock floor until the wire container could be moved.  Tr. !47-48.  From this testimony, the reasonable inference can be drawn by the trier of fact that, once the wire container was sufficiently unloaded, the handler could singlehandedly move it off the scissor jack and onto the loading dock, place the mail back in the container, and move it into the facility.  The inference can also be drawn that this could be accomplished with considerably less likelihood of injury

than the handler might suffer by levering the fully-loaded container off the scissor jack with a shoring bar.

In addition, plaintiff testified that he could have asked the mail handler at the P&DC to split the load into two containers.  Under the circumstances presented by the testimony and other evidence at trial, this was a feasible alternative which would likewise have minimized the "sticking" problem plaintiff encountered at the Dunkirk loading dock, and the likelihood of the injury he suffered.

Accordingly, the Court finds that defendant has satisfied its burden to establish by a preponderance of the evidence that plaintiff should bear some proportional responsibility for the damages suffered, "based on the relative culpability and causal significance of [his] conduct."  *Integrated Waste Services, Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 300 (2d Cir. 1996).  Having duly weighed the factors contributing to the injury and the parties' relative culpability, the Court also finds it reasonable to diminish the damages recoverable in this case by 10 percent.

## II.    Damages

Under New York law, if the trier of fact finds the defendant negligent, and that the defendant's negligence is the proximate cause of the plaintiff's injuries, the plaintiff is entitled to recover "a sum of money which will justly and fairly compensate the plaintiff for the loss resulting from the injuries sustained."  *Kehrli v. City of Utica*, 105 A.D.2d 1085, 1083, 482 N.Y.S.2d 189, 190 (4th Dep't 1984), *quoted in Robinson*, *supra*, 330 F. Supp. 2d at 290.  Generally, a plaintiff may recover for past and future loss of earnings, medical expenses, and mental and physical pain and suffering attributable to the

defendant's negligence.  *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1082 (2d Cir. 1988) (citing 36 N.Y.Jur.2d *Damages* § 57, at 102-03).

Pain and suffering has been held to encompass recovery for physical pain, the adverse emotional consequences attributable  to that pain and the injury that caused it, and loss of enjoyment of life.  *McDougald v. Garber*, 73 N.Y.2d 246, 253-55 (1989). There is no precise rule for fixing the value of pain and suffering.  Instead, the trier of the facts must determine the  value from all of the evidence in the particular case. *DiPirro*, *supra*, 43 F. Supp. 2d at 345.  Damages for future pain and suffering may be recovered only when it is reasonably certain from the  evidence that such damages will necessarily result from the original injury.  *Id.*  As the New York Court of Appeals has noted, "an award of damages to a person injured by the negligence of another is to compensate the victim, not to punish the wrongdoer.  The goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred."  *McDougald*, *supra*, 73 N.Y.2d at 253-54 (citation omitted).

An award of damages for past or future economic loss must be reduced by collateral source income, N.Y.C.P.L.R. 4545(c), and any award for future economic loss or future pain and suffering must be discounted to present value.  *Ulrich*, *supra*, 853 F.2d at 1083.  Additionally, as recognized by the Court in its order dated August 25, 2010, plaintiff's maximum recovery is limited pursuant to 28 U.S.C. § 2675(b) to the amount set forth in his administrative claim – $750,000.

### A.    Lost Wages

Plaintiff's economist, Dr. Reiber, was the only witness called at trial to offer proof regarding an appropriate method for the Court to utilize in calculating past and future economic loss suffered by plaintiff as a consequence of the injuries traceable to the October 26, 2005 occurrence.  Dr. Reiber presented two separate sets of calculations of past and future lost wages, as set forth in his expert report (Exh. 65) and explained during his testimony at trial: Set #1, with no reduction for any period of unemployment, and Set #2, representing reduced lost wages based on a 6% chance of unemployment. Notwithstanding Dr. Reiber's testimony that Set #2 represented the standard method used by economists to calculate lost wages, the Court gives credence and weight to plaintiff's testimony that he has never applied for unemployment benefits and has no intention of doing so.  Accordingly, the Court will rely on Dr. Reiber's calculations in Set #1, representing plaintiff's lost wages unreduced by any period of unemployment.

### 1.    Past Wages

Dr. Reiber has calculated plaintiff's lost past wages at $131,021.  Defendant does not dispute the essential numerical calculation, but contends that the Court should reduce this amount to account for Dr. Reiber's improper assumption that plaintiff was regularly paid 2.5 hours of weekly overtime, and received 401(k) contributions of $3,000 yearly while working at Wayman Trucking.

Upon review of the testimony and exhibits in the trial record, the Court agrees with defendant's contention in this regard.  There is simply no evidence to support

Dr. Reiber's inclusion of overtime and 401(k) contributions.  Although plaintiff testified

that he regularly worked "full time, 40 hours plus …" (Tr. 104), he submitted no

accounting records or other documentation to support the assumption that he averaged

2.5 hours of overtime per week, and there is no testimony or other evidence regarding

any 401(k) contributions made on plaintiff's behalf by Wayman Trucking.

Accordingly, Dr. Reiber's calculation of lost past wages in the amount of

$131,021 is reduced by 6.25% ($8,189) to account for improper inclusion of lost

overtime, and by $19,207 to account for improper inclusion of lost 401(k) contributions,

for a total award of lost past wages in the amount of $103,625.

### 2.    Future Wages

Dr. Reiber's lost future wage calculations in Exhibit 65 are presented under two

basic scenarios: (1)  plaintiff will be able to continue working, and (2) plaintiff will be

unable to work beyond age 53.  Dr. Reiber provides separate amounts of lost future

wages calculated cumulatively to plaintiff's birthday for each year from 2012 to 2028,

which is the year plaintiff turns 67 and becomes eligible for unreduced Social Security

benefits.  Thus, in Scenario (1), Dr. Reiber calculates lost future wages to a maximum

of $380,752 in the year 2028, based on the assumption that plaintiff would be able to

work at J.C. Penney and Independent Security Service until his retirement age of 67.  In

Scenario (2), Dr. Reiber calculates lost future wages to a maximum of $1,091,474 in

2028, based on the assumption that plaintiff would be unable to work past the age of

53.

Defendant contends that scenario (2) should be rejected outright, as there is insufficient evidence to support a finding that plaintiff will be unable to work full-time beyond the age of 53.  In this regard, the Court notes plaintiff's testimony describing the light physical demands of his duties as a Loss Prevention Supervisor, where he spends the majority of his time sitting while doing paperwork or watching closed-circuit television monitors, with some time spent walking around the store, and no lifting.  He testified that he took the position at J.C. Penney because it allowed him to sit, stand, walk, or even lie down at his discretion in order to accommodate his physical limitations.  Tr. 108, 180-81.  Since taking the job, he has received promotions, pay raises, and company awards recognizing his accomplishments, and his job evaluations reflect his "top level performance" and "excellent attitude."  Tr. 106-07).  The Court also notes Dr. Leddy's opinion that plaintiff could be expected to work at this job until age 65.  Tr. 222-23.

On the other hand, plaintiff's treating surgeon, Dr. Moreland, gave his opinion that plaintiff has already exceeded the work life expectancy for a 50-year old male with the same injury, and that it was statistically unlikely that plaintiff would be able to continue working to the age of 65.  Tr. 57-60.  Defendant argues that, in the absence of any supporting statistics, studies or other documentary evidence, Dr. Moreland's opinions must be regarded as speculative.  However, the same can be said for Dr. Leddy's opinion that plaintiff could be expected to work at his current job until age 65.  Tr. 222-23.  In any event, the Court agrees with Dr. Moreland's assessment that plaintiff is a very credible self-reporter, and must give considerable weight to plaintiff's testimony regarding his pain and physical limitations while performing even the light

-36-

physical demands of his current job, as well as his diminished activity at home.  Tr. 107-

11.  Considered along with the totality of the credible medical, expert, and lay testimony

presented at trial with respect to plaintiff's work life expectancy, the Court deems it

appropriate to compromise the difference between the two scenarios presented by

Dr. Reiber.  Accordingly, for the purposes of assessing lost future wages in this case,

the Court accepts Dr. Reiber's assumptions that plaintiff will be able to keep working

35 hours a week at his present job with J.C. Penney, and 14 hours a week at his

present job with Independent Security, until the age of 60.  At that point, assuming

Dr. Reiber's applied annual inflation rate of 2.6%, plaintiff's cumulative lost future wages

will amount to $526,489, discounted by 2% to reflect present value.

### 3.    Pain and Suffering

The Court also finds it appropriate to award damages for pain and suffering.

Although plaintiff has submitted no authority for such an award, defendant has

submitted citations to several New York cases in which the jury awarded damages for

pain and suffering for similar injuries.  For example, in *Clark v. Eklecco*, 2001 WL

34553842 (N.Y. Sup. Ct. 2001), the jury awarded $150,000 for pain and suffering for a

herniated disc at C6-7, disc protrusions at L1-2, L4-5, L5-S1, C7-  T1, T2-T3, and knee

injuries.   In *Smith v. Monroe Muffler*, 1998 WL 34201606 (N.Y. Sup. Ct. 1998), the jury

awarded $150,000 for pain and suffering for herniated discs at C6-7 & L4-5 and bulging

discs at C5-6, resulting in a discectomy at L5-S1 and a discectomy and fusion at C6-7

with bone grafting from his right hip, surgical scarring of his neck,  hip and lower back.

In *Parody v. Buker*, 1997 WL 682240 (N.Y. Sup. Ct. 1997), the jury awarded $171,600

for pain and suffering for herniated discs at L4-5 and L5-S1, requiring a hemilaminectomy and a discectomy and fusion at L4-5.  In *Loft v. Ziegler*, 2004 WL 4402057 (N.Y. Sup. Ct. 2004), the jury awarded $253,000 for pain and suffering for herniated discs C4-5, C5-6, rotator cuff tears, and disc  protrusions L4-5, L5-S1.

Based on these examples, each involving more serious injuries than those suffered by plaintiff in this case, defendant suggests that the Court should award a maximum of $150,000 for pain and suffering.  In the absence of any submission by plaintiff in support of a greater amount, the Court finds this suggestion acceptable.

Accordingly, plaintiff is awarded the amount of $150,000 for past and future pain and suffering, with damages for future pain and suffering discounted by 2% to reflect present value.

### 4.      Medical and Other Expenses

The parties have stipulated that New York Transportation WC Trust maintains a continuing worker's compensation lien in the amount of $146,821.50 against any recovery for injuries or damages arising out of the October 26, 2005 incident.  *See* Exh. 67; Tr. 306.

### 3.      Collateral Sources

Plaintiff testified that he received a total net payout of $70,200 from worker's compensation.  Tr. 113.  Accordingly, plaintiff's award of damages in this case will be reduced by this amount.

## **CONCLUSION**

Based on the foregoing, and for the reasons stated, the Court finds in favor of plaintiff, and awards plaintiff the sum of $103,625 for lost past wages; $526,489 for lost future wages (discounted by 2 percent to reflect present value); and $150,000 for past and future pain and suffering (with the award for future pain and suffering discounted by 2 percent to reflect present value).   The total amount of damages awarded shall be reduced by 10 percent to reflect plaintiff's comparative negligence, and by the amount of  $70,200 to reflect plaintiff's workers' compensation buyout.  Finally, the judgment shall also reflect the parties' stipulation as to the workers' compensation lien in the amount of $146,821.50.

The parties are directed to submit, within 30 days of the date of entry of this Order, a joint proposed judgment incorporating these findings (including, if appropriate, a provision for accrual of post-judgment pursuant to 31 U.S.C. § 1304).

So Ordered.

/s/ Hugh B. Scott
_____
Honorable Hugh B. Scott
United States Magistrate Judge

Dated:        Buffalo, New York
              March 12, 2012